# Exhibit 1

# Commission Order of August 11, 2015

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
Release No. 9886 / August 11, 2015

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 75665 / August 11, 2015

**INVESTMENT ADVISERS ACT OF 1940**
Release No. 4165 / August 11, 2015

**INVESTMENT COMPANY ACT OF 1940**
Release No. 31748 / August 11, 2015

**ADMINISTRATIVE PROCEEDING**
File No. 3-16738

| | |
|---|---|
| **In the Matter of**<br><br>ACADIA ASSET<br>MANAGEMENT, LLC AND<br>ERIC D. JACOBS,<br><br>**Respondents.** | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act"), against Acadia Asset Management, LLC ("Acadia") and Eric D. Jacobs ("Jacobs" and, together with Acadia, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the

Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings pursuant to Section 8A of the Securities Act of 1933, Section 21C of the Securities Exchange Act of 1934, Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Section 9(b) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offers, the Commission finds that:

### **Summary**

1.    Jacobs is the principal owner and managing member of Acadia, a New York, New York-based hedge fund investment adviser. From 2010 through 2013, Jacobs and Acadia breached their fiduciary duties as investment advisers. In 2010, Jacobs made redemptions in excess of his capital account balances. During 2010 and 2011, Jacobs redeemed his own investment interest and that of his father from an illiquid fund managed by Jacobs and Acadia, in preference over other fund investors. During 2010 through 2013, Jacobs caused one of the funds to pay Acadia management fees in excess of fees legitimately due. Finally, during 2010 and 2011, Jacobs and Acadia misrepresented to investors the riskiness of an investment in a hedge fund managed by Jacobs and Acadia, leading to near total losses for those investors.

### **Respondents**

2.    Eric D. Jacobs, 46 years old, resides in Phippsburg, Maine, and was the principal owner and managing member of Acadia during the relevant period. Jacobs also was a principal officer of Acadia Mutual Fund Management, LLC, an investment adviser registered with the Commission during 2010 through 2012, which was majority-owned by Acadia. Prior to his involvement with Acadia, and beginning in 1993, Jacobs was associated with a number of other financial services firms, including investment advisers and broker-dealers registered with the Commission. Jacobs has held Series 7 and Series 63 securities licenses since 1993.

3.    Acadia Asset Management, LLC is a Delaware limited liability company, formed in September 2008, which has its principal place of business in New York, New York. Acadia provided investment advisory services to a number of hedge funds including, among others, Acadia Master Fund I, LP, Acadia Fund I, LP, Acadia Liquidity Master Fund, Ltd., Acadia Liquidity Fund, LP, AAM Liquidity Fund, LP, Acadia Liquidity Fund, Ltd., and to at least one individual investor. During the relevant period, Acadia's advised funds had total assets under management ranging from a high of approximately $8 million to a low of approximately $600,000.

## Other Relevant Entities

### Acadia Funds

4.  Acadia Master Fund I, Ltd. ("Master Fund"), is a Cayman Islands limited company formed in 2004. Master Fund was organized for the purpose of trading securities and it commenced operations in January 2005. It has two "feeder" funds as investors in a "master-feeder" investment structure: Acadia Fund I, LP and Cerulean Partners, Ltd.

5.  Acadia Fund I, LP ("Fund I"), is a Delaware limited partnership formed in 1996. Fund I is a feeder fund for Master Fund, and it invested substantially all of its assets in Master Fund.

### Acadia Liquidity Funds

6.  Acadia Liquidity Master Fund, Ltd. ("Liquidity Master Fund") is a Cayman Islands limited company formed in 2009, when it commenced operations. Liquidity Master Fund is the master fund in a master-feeder investment structure. During the relevant period, Liquidity Master Fund had as many as three feeder funds, each of which invested all or substantially all of its assets in Liquidity Master Fund: Acadia Liquidity Fund, LP, AAM Liquidity Fund, LP, and Acadia Liquidity Fund, Ltd. (the "Liquidity Feeder Funds"). Liquidity Master Fund had the same investment strategy as the Liquidity Feeder Funds, and was responsible for conducting all of, or substantially all of, the trading operations for the Liquidity Feeder Funds.

7.  Acadia Liquidity Fund, LP is a Delaware limited partnership formed in 2008 that commenced operations in January 2009. Effective July 24, 2010, the fund was terminated by its general partner, an affiliate of Acadia, following the death of one of the fund's managers.

8.  AAM Liquidity Fund, LP is a Delaware limited partnership formed in 2010.

9.  Acadia Liquidity Fund, Ltd. ("Liquidity Fund, Ltd.") is a Cayman Islands limited company formed in 2009.

## Background

### Jacobs Redeemed Assets in Excess of His Capital Account in Fund I

10. As of December 31, 2009, Jacobs personally had a capital account balance of $196,900 with Fund I. On June 18, 2010, Jacobs began submitting letters of authorization ("Redemption Letters") to Fund I's prime broker and cash custodian ("Prime Broker"), instructing the Prime Broker to redeem Jacobs' interest in Fund I in increments Jacobs specified, and to remit the redemption proceeds to bank accounts in Jacobs' name. Jacobs calculated his

3

capital account balance based on his own, undocumented estimate of Fund I's net asset value ("NAV").[1]

11.     Jacobs prepared, signed and submitted to the Prime Broker eight Redemption Letters during 2010. The first six of such Redemption Letters (sent between June 18 and September 14, 2010) identified Jacobs as the redeeming partner. Jacobs' redemptions over this time period totaled $205,000.

12.     Jacobs bore primary responsibility for tracking Acadia fund investors' capital account balances, including his own. At or around September 2010, Acadia's Chief Operating Officer ("COO") warned Jacobs that his own capital account was overdrawn.

13.     Nonetheless, on October 8, 2010, Jacobs submitted a seventh Redemption Letter to the Prime Broker, requesting a redemption and transmittal of $41,000 to an account in the name of a party other than Jacobs. Although the October 8 letter was in fact a redemption request by and for Jacobs, the letter – submitted after Jacobs was told his account was overdrawn – for the first time omitted any reference to Jacobs himself as the redeeming partner. Also, unlike the preceding six Redemption Letters, the October 8 letter used the phrase "partner distribution" and not partner "redemption" to describe the purpose of the request.

14.     Based on the October 8 letter, Fund I's Prime Broker remitted redemption proceeds to the party named in the letter, which was *not* a Fund I investor. Jacobs used the $41,000 remittance to repay a personal debt owed by Jacobs to that party.

15.     On October 29, 2010, Jacobs submitted an eighth Redemption Letter, instructing the Prime Broker to remit $140,000 in proceeds to an Acadia account, stating: "Please make a notation in the ledger to reflect this being an equity withdrawal and 4th quarter fee." Jacobs subsequently told the COO that a certain portion of the remittance was to pay management fees owed to Acadia and the remainder was to fund a redemption request by Jacobs.

16.     In making the October 8 and October 29 redemptions, Jacobs knew, or was reckless in not knowing, that his capital account balance was inadequate to cover these redemptions and, as a result, his redemptions were paid from funds to which he was not entitled. Jacobs' over-redemptions totaled $57,000.

**Jacobs Paid Acadia Excess Management Fees From Fund I**

17.     Fund I's offering memorandum discloses that Acadia is entitled to receive a management fee, payable quarterly in advance, equal to 2% per annum based on the Master

---

[1] During summer 2010, Jacobs permitted other of Fund I's investors to redeem a portion of their limited partnership interests, but at a lower NAV, calculated as of December 31, 2009, purportedly because that was the last time prior to such redemptions that Fund I's administrator had calculated Fund I's NAV.

4

Fund's NAV. At the beginning of 2010, the Master Fund had an NAV of approximately $6 million (approximately 25% of which was exempt from management fee accrual as a result of management fee waivers granted to certain preferred limited partners).

18. In or around October 2010, Acadia had undrawn accrued management fees owed to it of approximately $26,000, for Fund I's fourth quarter. However, Jacobs submitted the October 29, 2010 letter described above, and directed that Fund I pay Acadia management fees in an amount in excess what Acadia was due.

19. When Jacobs paid Acadia excess management fees from Fund I in October of 2010, Jacobs knew, or was reckless in not knowing that, in fact, Acadia was not entitled to those management fees.

20. Throughout 2011, Jacobs continued to direct management fee payments from Fund I to Acadia.

21. On May 15, 2012, Fund I's administrator notified Jacobs by email that Respondents owed Fund I and Master Fund certain amounts for over-redemptions by Jacobs, management fee over-payments to Acadia, and expense reimbursements that Acadia had charged to Fund I. The administrator reminded Jacobs of this information by email in June and August 2012.

22. In September 2012, Jacobs notified Fund I's auditors that illiquid assets held by Fund I had deteriorated, necessitating a 65% write-down in the value of these assets, which comprised the greatest proportion of assets included within the fund's NAV at December 31, 2011.

23. Notwithstanding the fact that Jacobs knew, or was reckless in not knowing, that Respondents owed Fund I money, and that Fund I had taken a write-down, in July 2013, Jacobs transferred approximately $97,000 in management fees from Fund I to Acadia. Jacobs never documented any support for these management fees. Jacobs transferred nearly all of the $97,000 from Acadia into an account in Jacobs' name.

**Jacobs Preferentially Redeemed His and His Father's Investments in Fund I**

24. In the aftermath of the financial crises, Fund I's assets had lost significant value and were rendered illiquid. During 2008, Acadia offered "in-kind" redemptions to those investors who sought to redeem their Fund I investment, that is, investors were offered ratable portions of the illiquid securities held by Fund I. Alternatively, investors were given the option to be classified as "liquidating" partners, as to which Acadia would use its "best efforts" to obtain liquidity to fund redemption requests.

25. By 2010, Fund I's assets were largely comprised of equity issued by highly-leveraged, pooled, trust-preferred securities of insurance companies and local and regional banks, as well private placements in local and regional banks.

26.	In or around August 2010, Respondents capped certain redemptions from Fund I. Specifically, Respondents agreed to pay Fund I's "liquidating partners" only 15% of their respective capital account balances as of December 31, 2009, in consideration of their outstanding redemption requests.

27.	Notwithstanding the 15% caps placed on Fund I's liquidating partners, during 2010, Jacobs redeemed more than the entire balance of his own capital account.

28.	In addition, throughout 2011 and 2012, Respondents redeemed Jacobs' father's investment in Fund I for Jacobs' own personal use – in an amount that also exceeded the 15% cap he imposed on other investors. Redemptions of Jacobs' father's interest totaled $400,000. These redemptions exceeded what his father was due by $167,365, assuming Jacobs had applied the same cap to redemption of his father's interest.

29.	Jacobs used the $400,000 to pay his living expenses, and to fund a personal investment.

30.	Jacobs knew, or was reckless in not knowing, that he redeemed his own and his father's interest in Fund I in preference of other Fund I investors.

**Respondents Misrepresented to Investors the Riskiness of Investing in Acadia Liquidity Fund**

31.	During 2010 and 2011, Respondents disseminated materially false and misleading statements concerning the historical performance, risk, volatility, investment strategy and use of leverage in the "Acadia Liquidity Fund."[2]

---

[2] "Acadia Liquidity Fund" was used by Respondents in marketing material and meant to encompass investments in the Liquidity Feeder Funds who shared the same investment strategy as each other and their common master fund, Liquidity Master Fund. Liquidity Master Fund was responsible for all or nearly all of the trading operations of Acadia Liquidity Fund.

### Historical Performance

32. Respondents' marketing material disseminated to investors and prospective investors included an Acadia Liquidity Fund performance chart that omitted substantial losses sustained by the fund. In other words, Proposed Respondents selected and advertised the time period with the most favorable results. Specifically, during its first two months of operation, Liquidity Master Fund (the master fund that conducted trading operations on behalf of the feeder funds) lost more than 13% in September and October of 2010. Respondents' marketing material completely omitted these significant losses, presenting only positive returns experienced in later periods. For example, an April 2011 iteration of marketing material included the following performance chart:

For additional information about Acadia Funds and our other investment products, please email, call or write:
Acadia Asset Management, LLC
One Penn Plaza, 36th Floor
New York, NY 10119
Tel: (212) 671-1111
www.acadiafunds.com
Email: info@theacadiafunds.com

**YTD Performance Table**

| | | |
|---|---|---|
| Acadia Liquidity Fund, Ltd (Nov 2010 - Feb, 2011) | | 13.66% |
| S&P 500 (Nov 2010 - Feb, 2011) | | 12.17% |
| Performance Correlation to S&P 500 | | - 0.85 |
| Sharpe Ratio (2% RF) | | 11.01 |
| Assets Managed In Strategy: | | $14 Million |

| Year | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | | | | | | | | | | | 4.35% | 2.45% | +6.90% |
| 2011 | 3.79% | 2.43% | | | | | | | | | | | +6.32% |

*Performance through January 2011 is estimated until audited by Gemini Fund Services with February estimated by the Manager
PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS

33. The performance chart was materially false and misleading because it omitted material information necessary for an investor or prospective investor to assess the performance of the Acadia Liquidity Fund.

### Risk/Volatility

34. According to a December 2010 iteration of marketing material prepared and disseminated by Respondents, the Acadia Liquidity Fund delivered "an average annualized rate of return in excess of 25% while boasting a [S]harpe ratio of 1.82% and an annual standard deviation of return of only 13.1% as compared with the S&P 500."[3] The December 2010 marketing material downplayed the risk and emphasized the safety and low volatility of the Acadia Liquidity Fund, asserting: "Our performance volatility targets are by design, half that of the S&P 500 Index, while our long term performance targets aim to return double that of the S&P 500 Index itself."

---

[3] A "Sharpe ratio" is a measure of the risk-adjusted performance for a fund. The greater the fund's Sharpe ratio, the better its risk-adjusted performance has been. During the 3 years ended July 2014, the Sharpe Ratio of the S&P 500 ETF SPY was 1.31. Standard deviation is a metric applied to the annual rate of return of an investment to measure the investment's volatility. Standard deviation, also referred to as historical volatility, is used by investors as a gauge for the amount of expected volatility. As standard deviation of return increases, volatility increases. In the 3 years ended July 2014, the S&P's standard deviation was 12.23.

7

35. These statements were false and misleading for the following reasons:

   a. The December 2010 marketing material presented the fund's Sharpe ratio and standard deviation for a stated time period; however, these metrics excluded the last month of returns experienced by Acadia Liquidity Fund in the stated time period, effectively concealing a 20% loss that would have revealed the fund to be much more volatile;

   b. The December 2010 marketing material's low volatility metrics were based on 16 months of fund returns that related to a predecessor fund to the Acadia Liquidity Fund on offer in December 2010, which had a different investment strategy that was not used by the Acadia Liquidity Fund on offer in December 2010;

   c. In addition to excluding a 20% monthly loss, the December 2010 marketing material's low volatility and positive performance metrics were arrived at through use of a conventional leverage facility consisting of 2-3x leverage (or slightly more for positions closed at the end of the trading day); however, the Acadia Liquidity Fund had been utilizing an extraordinary 10x leverage facility since September 2010, which was not factored into the metrics presented, downplaying anticipated volatility and creating a false impression concerning risk of loss.

### Investment Strategy/Use of Leverage

36. Respondents disseminated marketing material to investors and prospective investors in the Acadia Liquidity Fund, promoting the fund as a diversified equity strategy comparable to the S&P 500 Index, investing in "only the most liquid U.S. stocks and indices." The offering memoranda for the Acadia Liquidity Feeder Funds included generalized references to the permitted or potential use of leverage.[4]

37. In fact, Respondents invested all of the Acadia Liquidity Master Fund's assets with a leverage provider through a high risk "Structured Integrated Note" that allowed

---

[4] For example, the Explanatory Memorandum for Liquidity Fund, Ltd., provided as follows, in pertinent part:

> "To achieve its investment objective, the Fund may … employ leverage…"; and
>
> "Leverage: The Fund may utilize leverage in its investment program when the Investment Manager considers it appropriate. However, the use of leverage may, in certain circumstances, maximize the adverse impact to which the Fund's investment portfolio may be subject."

Respondents to trade on as little as 10% margin (i.e., a 10x leverage multiple). Under the note, the fund was to receive a 75% "coupon" based on the trading profits of a reference index comprised of a basket of securities selected and traded by Respondents (primarily through Jacobs). The remaining 25% of any trading profits was retained by the leverage provider, which maintained ownership of the traded securities. The leverage provider was entitled to its 25% profit participation regardless of the amount of leverage deployed.[5]

38. Acadia Liquidity Fund ultimately lost nearly 85% of its value in a single week less than a year after launching when the highly leveraged bets it made turned against it.

39. Respondents knew, or were reckless in not knowing, that the disclosures to Acadia Liquidity Fund investors and prospective investors concerning the fund's historical performance, risk, volatility, investment strategy and use of leverage were materially false and misleading.

## Violations

40. As a result of the conduct described above, Respondents Jacobs and Acadia willfully violated Section 17(a) of the Securities Act, which prohibits fraudulent conduct in the offer or sale of securities.

41. As a result of the conduct described above, Respondents Jacobs and Acadia willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities.

42. As a result of the conduct described above, Respondents Jacobs and Acadia willfully violated Sections 206(1) and 206(2) of the Advisers Act, which make it unlawful for any investment adviser, directly or indirectly, to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."

43. As a result of the conduct described above, Respondents Jacobs and Acadia willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, which make it unlawful for any investment adviser to a pooled investment vehicle to "[m]ake any untrue statement of a material fact or omit to state a material fact necessary to make the statements

---

[5] Within the funds' solicitation period, Jacobs also acquired options, in contravention of risk parameters imposed by the leverage provider under the terms of the leverage facility. In a May 8, 2011 email, Jacobs admitted that the fund's volatility went "through the roof" because Jacobs was "running approximately $8mm in non-delta adjusted $ exposure in the short put options for this cycle." Not long after this email, the options Jacobs acquired matured, causing a loss of approximately 25% of shareholder equity in the Acadia Liquidity Fund.

made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle" or "engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest, to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Sections 203(e), 203(f) and 203(k) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A. Respondents Jacobs and Acadia cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1), 206(2), 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder.

B. Respondent Jacobs be, and hereby is:

> barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization; and prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

C. Any reapplication for association by Respondent Jacobs will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, the satisfaction of any or all of the following: (a) any disgorgement ordered against Jacobs, whether or not the Commission has fully or partially waived payment of such disgorgement; (b) any arbitration award related to the conduct that served as the basis for the Commission order; (c) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (d) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

D. Respondent Acadia is censured.

E. Respondents Jacobs and Acadia shall, within 14 days of the entry of this Order, pay disgorgement on a joint and several basis, which represents profits gained and/or losses avoided as a result of the conduct described herein of $321,365.00 and prejudgment interest of $32,750.79 to the Securities and Exchange Commission. If timely payment is not made, additional

interest shall accrue pursuant to SEC Rule of Practice 600.  Respondent Jacobs shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $300,000 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.  Payment must be made in one of the following ways:

> (1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;
>
> (2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or
>
> (3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Eric D. Jacobs and Acadia Asset Management, LLC as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Valerie A. Szczepanik, Assistant Director, Asset Management Unit, New York Regional Office, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, NY 10281-1022, and to Timothy Casey, Assistant Director, Legal Operations, New York Regional Office, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, NY 10281-1022, or such other person or address as the Commission staff may provide.

   F. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended ("Fair Fund distribution").  Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, Respondent shall not argue that Respondent is entitled to, nor shall Respondent benefit by, offset or reduction of any award of compensatory damages by the amount of any part of his payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that Respondent shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this

paragraph, a "Related Investor Action" means a private damages action brought against one or both of the Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondents of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Brent J. Fields
Secretary